## GENERAL FOODS CORPORATION v. SEEMAN BROS., Inc.

District Court, S. D. New York.
Aug. 2, 1932.

George W. Case, Jr., of New York City (Melville Church and Clarence B. Des Jardins, both of Washington, D. C., and George W. Case, Jr., of New York City, of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (George F. Scull and Newton A. Burgess, both of New York City, of counsel), for defendant.

COXE, District Judge.

This is a suit for infringement of the Douglas patent, No. 1,304,166, issued May 20, 1919, for a food product and its method of manufacture. The patent relates to a process for manufacturing jellies, jams, and preserved fruits with a liquid pectin, covered by a companion patent of the same inventor, No. 1,082,682, issued December 30, 1913. Both patents were upheld in the Circuit Court of Appeals in this circuit in Douglas Pectin Corp'n v. Armour & Co., 27 F.(2d) 814; and in the present suit the defendant seeks, among other things, to relitigate the validity of patent No. 1,304,166.

The plaintiff and its predecessors have for a number of years been large manufacturers of concentrated pectin made according to patent, 1,082,682, which they have advertised and sold extensively under the trade-name "Certo." The product has always been in liquid form, and except for bulk sales to large consumers, has been distributed in bottles, accompanied by booklets containing recipes showing how the product might be used in making jams and jellies. It is asserted that these recipes are in accordance with the process shown by the patent in suit.

The product patent, No. 1,082,682, expired December 30, 1930, and the manufacture and sale of the Certo preparation is, therefore, now open to the public. The process patent in suit, No. 1,304,166, on the other hand, owing to difficulties encountered in the Patent Office, did not issue until May 20, 1919; and the plaintiff now seeks, by means of this patent, in effect to extend its monopoly on sales of Certo until the expiration of the patent in suit on May 20, 1936.

The defendant is a wholesale grocer in New York City, and sells a powdered pectin manufactured by the Skinner Manufacturing Company of Omaha, Neb. This powdered pectin is sold in package form, and has inclosed a recipe book containing recipes for making jams and jellies with the Skinner pectin. The plaintiff contends that any one who uses these recipes in making jams or jellies with the Skinner powdered pectin is an infringer of the patent in suit, and that the defendant in inducing such use is a contributory infringer.

The only claim relied on is claim 5, which reads as follows: "The process of making fruit jellies consisting in adding to fruit juice, a given quantity of sugar and a proportional quantity of concentrated fruit pectins sufficient to jellify the mass without prolonged boiling."

The defendant, in addition to contesting validity, denies infringement. It also insists that the case is ruled by the recent decision of the Supreme Court in Carbice Corp'n of America v. American Patents Development Corp'n, 283 U. S. 27, 51 S. Ct. 334, 75 L. Ed. 819, and that the complaint should be dismissed for that reason.

The opinion in the Armour Case states, at page 817 of 27 F.(2d), that in the product patent, No. 1,082,682, "Douglas taught how to manufacture pectin as a separate article of commerce, without the presence of any substantial amount of sugar, that would cause jellification of the pectin fluid after digesting the pomace, and with an almost complete deflavoring." It is also stated, at page 823 of 27 F.(2d) that the Douglas pectin was a "desugared and deflavored" pectin. And it was because Douglas was the first to produce such a "desugared and deflavored" pectin as "a separate commercial article" that the patent was sustained. The process patent in suit, No. 1,304,166, was similarly upheld for the reason that by it "the trade was taught the process of using the pectin of the first [i. e., the product patent] in such a way as to avoid loss of the product by boiling, as well as injury to the fruit flavor" (page 817 of 27 F.(2d)). And running through the entire opinion is the thought that the two patents are dependent on each other, and that the process patent was designed merely to supplement the product patent, by showing how

the patented pectin might be advantageously used in the practical work of jelly making.

The defendant insists, however, that in the Armour case there was an inadequate showing of the prior art; that the invention of the patent in suit was expanded during the Patent Office proceedings; and that the patent is void for indefiniteness.

It is true that in the Armour Case the principal defenses centered around the alleged prior uses, but I am satisfied from a careful reading of the opinion of the Circuit Court of Appeals that there was a complete understanding of the prior art, and I cannot see that the new references, now introduced for the first time, in any way undermine or affect the decision.

The main reliance of the defendant in its present attack on the patent in suit is placed on the Goldthwaite articles, published in 1909, 1910, and 1911. These articles were set up in the answer in the Armour Case, but were not introduced at the trial, and do not appear to have been considered either by the District Court or the Circuit Court of Appeals. They describe the well-known practice of the prior art to combine juice, acid, sugar, and pectin in suitable proportions, and then boil to obtain the necessary concentration. They contain definite instructions regarding the proportions of the various ingredients for particular fruits, the amount of boiling needed in specific cases, and other valuable information essential to jelly making. These articles also show a complete understanding of the nature and characteristics of pectin, and state that it may be extracted from the white inner skins of oranges and lemons, and then used to fortify other fruit juices deficient in pectin. But when the articles are given all the credit to which they are justly entitled, they still fall short of anticipating Douglas, or of disclosing the Douglas method; for Douglas was the first to produce "as a commercial article" a concentrated pectous solution, which, when combined with other necessary ingredients in proper proportions, would make a satisfactory jelly without a resort to the old boiling methods of the prior art; and he taught, also, how such a pectous solution might be used in practical jelly making.

The other reference which the defendant's expert selected as disclosing a close approximation of the Douglas process was the British patent to Scott & McDonald, No. 4,376, patented October 30, 1878. This patent was in the record, and considered in the Armour Case, and it seems hardly necessary, therefore, to make any comment upon it. It is sufficient for the present purpose to say that it does not in any way suggest the process of the Douglas patent.

The defendant asserts, also, that Douglas did not in fact eliminate or cut down appreciably the boiling time of the prior art; and the Certo recipes are referred to to substantiate the contention. These recipes, it is true, show a considerable period of simmering during the preparation of many of the fruits, but the boiling after the addition of the Certo is invariably from one to two minutes; and I think Loesch, one of plaintiff's witnesses, was correct in saying that this slight boiling after the addition of the Certo was desirable in order properly to mix the ingredients, and make the process "fool proof for the housewife." With the Goldthwaite recipes, there was, generally speaking, no outside pectin, and it is difficult, therefore, to compare them intelligently with the recipes in the Certo booklets; but they do show total boiling periods for the different fruits specified in the articles ranging from five to nineteen minutes; and those boilings were principally for the purpose of concentration by evaporation, as otherwise the pectin would not have reached a sufficient concentration to make a satisfactory jelly. The addition of pectin from an outside source, in the manner shown in the Douglas process, largely eliminated the necessity for this concentration by evaporation, and then it became necessary to boil only for the purpose of sterilization and proper mixing.

It is argued, however, that the words "without prolonged boiling," as appearing in claim 5, are meaningless, and that the patent is indefinite for that reason. This same contention was made and answered in the Armour Case, and it will serve no useful purpose to repeat what was said on that branch of the case in the Circuit Court of Appeals. The specification uses the words "prolonged boiling" to characterize the amount of boiling required by the prior art practice to concentrate the pectin sufficiently to produce a satisfactory jelly; and the words "without prolonged boiling," as used in claim 5, clearly mean a boiling less than that of the prior art. I have no doubt that the teaching of the Douglas patent, if closely adhered to, will produce a jelly without evaporation by boiling; but that is the ideal condition, and I think that any boiling which cuts down that amount of boiling indicated by the prior art satisfies the language of the claim.

The defendant insists, also, that the plain-

tiff's contentions with respect to "excess sugar" and retention of flavor are unfounded. It is, of course, true that the correct amount of sugar is dependent on the pectin and water in the mixture; and where, as with the Certo preparation, pectin and water are added from an outside source, it necessarily follows that there must be additional sugar to offset the effect of the added pectin and water. That is all that the statement in the patent means when it says that "the amount of the pectous substance to be added should be sufficient to combine with the surplus moisture in the fruit juices and the excess sugar to make a firm jelly." Clearly the injection of Certo requires a reproportionment of the different ingredients, and that is accomplished in the Douglas process by adding more sugar than the prior practice demanded. With respect to the contention that the Douglas process tends to preserve the flavor of the fruit, there was little in the tests made at the trial to sustain the point; but, in view of the shortening of the boiling time, due to the invention, I am inclined to think there is some retention of the natural flavor.

The defendant further contends that the patented process is unworkable because it fails to mention acid. It is true that neither in the specification nor in claim 5, which is the only claim relied on in the present suit, is any mention made of acid as a necessary ingredient of the process, but claim 3 specifies "an acid solution of concentrated fruit pectins," and although that claim is not relied on, it may be referred to as part of the disclosure of the patent (Wisconsin Furniture Co. v. Blumberg [C. C. A.] 212 F. 738); and the presence of the acid may be implied.

Finally, it is insisted that the invention was expanded during the prosecution of the patent in the patent office. There were two amendments, which are the subject of criticism; the first on September 29, 1916, and the second on January 29, 1917; and aside from the insertion of qualifying words in the specification, such as "considerable portion," "material," "approximately," and "considerable," the principal objection is to the change in the wording of claim 5 from "without boiling" to "without prolonged boiling." It is asserted that these changes were suggested by the Boyles patent, No. 1,067,-714, issued July 15, 1913, on an application filed October 16, 1912, and which was cited against the Douglas application by the Patent Office. It has, however, been stipulated that the Douglas invention antedated the Boyles filing date, so that the Boyles patent is unavailable as an anticipation or as proof of prior knowledge. It is referred to, though, by the defendant as bearing on the question of enlargement; and on that issue I do not think it discredits the patent in suit. The Boyles patent discloses the use of pectin and acid in dry granular form; and in the specification mention is made of the necessity for boiling "until the usual jelly tests may be observed." There was, however, nothing new in the idea of boiling to make jellies, and I cannot see that the Boyles patent suggested anything in that respect to Douglas. I do not think, either, that the addition of the word "prolonged," in claim 5, enlarged the invention. It was inserted merely out of abundance of caution, to cover the case of an infringer who might insist on a too literal construction of the claim; and it in no way changed the invention.

I am clear, therefore, that nothing new has been shown to disturb the decision in the Armour Case that claim 5 of the patent in suit is valid.

It is next asserted by the defendant that the suit cannot be maintained because of the decision in the Carbice Case, 283 U. S. 27, 51 S. Ct. 334, 75 L. Ed. 819, and although, on a superficial reading of the opinion in that case, there appears to be much to support the argument, I do not think that in reality the cases bear any close analogy. In the Carbice Case, the patent covered a transportation package which had, as one of its elements, solid carbon dioxide, an unpatented refrigerant, sold by the Dry Ice Corporation to its customers on invoices which contained a notice that the containers were only to be used with solid carbon dioxide obtained from the Dry Ice Corporation; and it was because of this attempt on the part of the Dry Ice Corporation to control the sale of solid carbon dioxide by improper license notices that the case was brought squarely within the earlier decision in Motion Picture v. Universal, 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959. This seems clear from Mr. Justice Brandeis' language at page 31 of the opinion in 283 U. S., 51 S. Ct. 334, 335, 75 L. Ed. 819, when he says that the owner of a patent "may not exact as the condition of a license that unpatented materials used in connection with the invention shall be purchased only from the licensor." It followed, therefore, as a necessary consequence, that a customer of the Dry Ice Corporation who used solid carbon dioxide purchased from some one other than the Dry Ice Corporation, in violation of the

license restrictions, could not be held as an infringer; and any one who knowingly sold the solid carbon dioxide to such a customer of the Dry Ice Corporation could not be sued as a contributory infringer. This is further emphasized by the statement at page 34 of the opinion in 283 U. S., 51 S. Ct. 334, 336, 75 L. Ed. 819, that the case is "wholly unlike" Leeds & Catlin v. Victor, 213 U. S. 325, 29 S. Ct. 503, 53 L. Ed. 816, which was "an ordinary case of contributory infringement." In the present case, there are no restrictive notices, and, even though Certo is fully open to the public, still any one, who, without a license, practices the patented process, is an infringer. It would seem clear, also, that any one who knowingly induces such an infringement is liable as a contributory infringer. Thomson-Houston Electric Co. v. Ohio Brass Co. (C. C. A.) 80 F. 712; Individual Drinking Cup Co. v. Errett (C. C. A.) 297 F. 733. I do not think, therefore, that the Carbice Case is controlling.

But do the Skinner recipes, when used in connection with the Skinner powdered pectin, infringe? I think not. The opinion in the Circuit Court of Appeals in the Armour Case states, at page 815 of 27 F. (2d) that the patent "relates to a process for making jams and jellies with the pectin covered by the first patent referred to" (i. e., patent No. 1,082,-682). It seems reasonably clear, therefore, that the Circuit Court of Appeals considered the two patents complements of each other.

There is little similarity also between the plaintiff's "desugared and deflavored" liquid pectin and the Skinner powdered pectin. The Skinner powdered pectin is made from citrus fruits, and is precipitated with alcohol. It contains 12.3 per cent. of pectin, 61 per cent. of cerelose or corn sugar, 19.2 per cent. total acidity, calculated as tartaric acid, 2.8 per cent. of sodium carbonate, and 4.7 per cent. moisture, calculated by difference. The cerelose or corn sugar is present to dissolve the powder in the fruit juice. The same is true of the sodium carbonate, which acts as a "bubbler" in the dissolving process. The remaining ingredients, namely, the pectin and the acid, are the only elements essential for jelly making. The Skinner preparation is in many respects similar to the precipitated pectin of the Jux and Ferrand French patent, No. 244,755, granted January 30, 1895. It is very much unlike the plaintiff's liquid pectin Certo, which contains 4½ to 5 per cent. pectin, 2.2 to 2.3 per cent. acid, about 2 per cent. sugar, and 90 per cent. water.

The defendant asserts that precipitated pectin is not concentrated pectin, and therefore does not respond to the language of claim 5. The ordinary meaning of the word "concentrated" is, however, broad enough to include a pectin concentrated by precipitation; but, in view of the prior art disclosures with respect to the use of precipitated pectin in jelly making, and the fact that the two Douglas patents, Nos. 1,082,682 and 1,304,-166, are complementary, I think the "concentrated fruit pectins" of claim 5 must be limited to the liquid compound of the Douglas patent, No. 1,082,682; and, as so limited, it is clear that the Skinner practice does not infringe.

That the two pectins are unlike in their manner of use is well illustrated by the differences in the Certo and Skinner recipes. With Skinner, the powdered pectin is first added to the prepared fruit juice, and then brought to a boil, and boiled for a brief interval. The Certo recipes, on the other hand, add the sugar to the prepared juice first, and bring to a boil; they then add the Certo pectin, and again bring to a boil. This difference in the manner of use of the two pectins is emphasized by the general directions appearing in the specification of the patent, where it is stated that the sugar is mixed with the fruit juice, and "the pectin is then added and the mixture is heated to a sufficient temperature to dissolve the sugar and sterilize the product."

It is true that the Skinner practice has eliminated a considerable part of the prolonged boiling of the prior art, in much the same way as the Certo product has; but despite the fact that with both preparations there is this curtailment of the boiling period, I am convinced that the Certo patent in suit was only intended to cover the process of using the product of the earlier patent; and I do not think it should now be broadened to cover anything else.

The complaint is dismissed, with costs.